**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
Case No.: 0:25-CV-60128**

EDLYNE THERVIL,

               Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC,

               Defendant.

**COMPLAINT AND JURY
TRIAL DEMAND**

## COMPLAINT

Edlyne Thervil ("Plaintiff") brings this action on an individual basis, against Equifax Information Services, LLC ("Defendant" or "Equifax") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing of Plaintiff's credit file with that of another consumer.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

(a)      The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public

confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."  15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently, Defendant has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

*Edlyne Thervil v. Equifax Information Services, LLC*
Complaint

21.     Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.     Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the

FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom.  Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).  Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco*

*Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30. No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31. Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

32. Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33. Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of the distinctive consumer.

34. Further, Plaintiff's claims also arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because Defendant mixed Plaintiff's credit file with that of a distinctive consumer.

35. Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation

of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

37.     Edlyne Thervil ("Plaintiff") is a natural person residing in Coral Springs, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.     Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District. Equifax can be served through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

39.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.     The information Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

*Edlyne Thervil v. Equifax*
*Information Services, LLC*
Complaint

41.     Equifax collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Equifax collects and maintains information about them. Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Equifax database. Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

44.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

45.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

46.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel,

insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

47.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

48.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## **DEFENDANT'S PROCESSING OF CREDIT INFORMATION**

49.    Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

50.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

51.    Defendant collects information from thousands of furnishers.

52.    The process by which Defendant receives, sorts, and stores information is largely electronic.

53.    Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

54.     Defendant takes credit information reported by furnishers and creates consumer credit files.

55.     Defendant maintains credit files on more than 200 million consumers.

56.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANT'S MIXED FILE PROBLEM

57.     Defendant knows that different consumers have similar names.

58.     Defendant knows that different consumers can have similar social security numbers.

59.     Defendant knows that different consumers with similar names can also have similar social security numbers.

60.     Defendant knows that public records often do contain identifying information such as social security numbers or dates of birth.

61.     Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

62.     Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

63.     From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

64.     Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the

FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

65. Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

66. A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

67. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

68. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

69. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

70. Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

71. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## **FACTUAL ALLEGATIONS**

### **Plaintiff's History with Equifax**

72.     In or around 2019, Plaintiff subscribed to an Experian membership to access and review the credit reports issued by the three major Credit Reporting Agencies: Experian, Equifax, and TransUnion.

73.     However, after obtaining her Experian membership and attempting to access her Equifax credit reports through Experian, Plaintiff was informed that Experian was unable to retrieve or review her Equifax credit report. Despite her efforts, Plaintiff was not provided with a satisfactory explanation for this inability to access her Equifax report.

74.     Ultimately, Plaintiff was able to access her Equifax credit report; however, following this initial retrieval, she was unable to review her Equifax credit file again during the period from 2020 to 2022.

75.     Plaintiff's inability to access her Equifax credit report during this approximately two-year period remained unexplained and was never resolved to her satisfaction.

76.     In or around January 2023, Plaintiff sought assistance from Credit Hero Score Support to improve her credit score. However, they were unable to retrieve her Equifax credit report, citing an inaccurately reported Social Security number that prevented them from verifying her identity. Credit Hero Score Support further advised Plaintiff to contact Equifax directly to address and resolve this issue.

77.     Over the course of several years and numerous attempts to obtain her Equifax credit file to monitor and verify her credit standing and profile, Plaintiff was consistently unable to access any of her Equifax credit reports.

78.     In or around June 2024, driven by concerns for her financial well-being and credit health, Plaintiff once again requested a file disclosure from Equifax to evaluate her credit standing and determine any necessary corrective actions. However, Equifax declined to provide the requested report, citing an inability to verify her personal identifying information.

79.     Plaintiff accessed her Equifax account to review her personal identifying information.

80.     Therein, Plaintiff discovered the inclusion of numerous items of personal identifying information on her credit file and reports that did not belong to her but were instead associated with her sister, Eduiana Thervil.

81.     Specifically, Plaintiff identified discrepancies in her credit file, including a different full name, a different date of birth, and even different last four digits of a Social Security number, none of which belonged to her.

82.     Upon information and belief, Defendant also included credit accounts that did not belong to Plaintiff in her Equifax credit file and reports.

83.     By reporting the aforementioned personal information, and credit accounts, in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's June 2024 Dispute to Defendant**

84.     On or about June 29, 2024, feeling frustrated and deeply concerned about the inaccuracies in her credit file, Plaintiff submitted a dispute letter to the Consumer Financial

Protection Bureau ("CFPB"). The CFPB forwarded the dispute to Defendant. In the letter, Plaintiff specifically contested the inclusion of personal identifying information that did not belong to her.

85.     By extension, Plaintiff's dispute also placed Defendant on notice of inaccurate accounts and credit inquiries associated with her credit file that did not correspond to her personal identifying information. Plaintiff's dispute by extension implicated the inaccuracies of the accounts and credit inquiries related to the personal identifying information that does not belong to Plaintiff.

86.     Along with her CFPB complaint/dispute letter, Plaintiff included a photograph of her Equifax account, which clearly displayed the inaccurate name, date of birth, and last four digits of a social security number that Defendant had erroneously reported.

87.     Plaintiff specifically requested that the CFPB direct Defendant to reinvestigate the disputed information, rectify the inaccuracies, and provide her with a corrected copy of her credit report.

**Defendant's Unreasonable Dispute Reinvestigation**

88.     Upon information and belief, Plaintiff's June 29, 2024, CFPB complaint was delivered to Defendant on or about June 29, 2024.

89.     On July 4, 2024, Plaintiff received a response from Defendant wherein Defendant claimed that they were again unable to locate a credit file in their database with the identification information provided by Plaintiff. Defendant further requested additional documents to verify Plaintiff's identity.

90.     Subsequently, on or about August 10, 2024, Plaintiff received a second dispute response from Equifax relating to her CFPB complaint submitted on or about June 29, 2024,

wherein Equifax informed Plaintiff that the disputed personal identifying information were verified as accurate.

91.     Defendant failed to conduct a reasonable investigation of Plaintiff's June 29, 2024, dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

92.     Thereafter, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the other consumer and Defendant likely continued to report the other consumer's information to Plaintiff's credit file.

93.     Upon information and belief, Plaintiff submitted numerous disputes to Equifax during the year of 2024, disputing the inaccurate personal identifying information incorporated into her Equifax credit file and reports.

94.     Upon information and belief, in each of these numerous disputes Plaintiff identified the inaccurate personal identifying information—resultant from a mix of her credit file with that of the distinctive consumer—and requested the immediate deletion and removal of all such inaccurate information from her Equifax credit file and reports.

95.     Upon information and belief, Plaintiff provided sufficient corroborating documentation and/or information demonstrating that such items of personal identifying information do not belong to Plaintiff and have no place in any consumer file or report about Plaintiff.

96.     Upon information and belief, Equifax failed to conduct reasonable reinvestigations of the numerous disputes Plaintiff submitted during the year of 2024 or any reinvestigation

whatsoever, to determine whether the disputed information was inaccurate, in violation of 15 U.S.C. § 1681i(a)(1)(A).

97.     Specifically, all of the disputed inaccurate personal information remained in Plaintiff's credit files and reports despite the comprehensive disputes submitted by Plaintiff demonstrating that such do not belong to her.

### Plaintiff's Mixed Credit File as of November 25, 2024

98.     Concerned about the state of her credit file and Defendant's lack of response, Plaintiff managed to obtain a copy of her Equifax credit report dated November 25, 2024, through her myEquifax account.

99.     Upon reviewing the contents of the November 25, 2024, credit file, Plaintiff was distressed to see that Defendant was still reporting the information of a distinctive consumer to Plaintiff's credit file and reports.

100.    Not only that, but Defendant was reporting the accounts that belonged to the consumer who Plaintiff was mixed with.

101.    Specifically, Defendant was reporting the following personal identifying information which did not belong to Plaintiff:

(a)     **Personal Information:**
        Name: Eduiana Thervil
        Social Security Number: XXX-XX-5884
        Date of Birth: Mar 24, 1988
(b)     **Contact Information:**
        2801 Riverside Dr Apt 406, Coral Springs, FL 33065
        465 NW 41ST ST Apt 2, Oakland Park, FL 33309
        1150 NW 80th Ave Apt 103, Margate, FL 33063
        4 Meacham LN, Tamarac, FL 33319
(c)     **Employment History:**
        FISERV
        CHEF E CATERING
        MRCEES CHATBOTS

102.    Defendant was reporting the following accounts which did not belong to Plaintiff:

    (a)    **Space Coast CU**
            Acc. No.*6844
            Date Opened: Jul 20, 2020
            Balance: $322

    (b)    **Capital One Bank**
            Acc. No.*5735
            Date Opened: Feb 08, 2024
            Balance: $225

103.    By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant yet again failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

104.    Further, Defendant was also reporting the following hard inquiries, with whom Plaintiff did not have an account relationship:

    (a)    **JPMCB AUTO FINANCE** Dated May 15, 2024;
    (b)    **CAPITAL ONE BANK USA NA** Dated Jan 31, 2024;
    (c)    **WESTLAKE SERVICE INC** Dated Dec 29, 2023;
    (d)    **GLOBAL LENDING SERVICES LLC** Dated Dec 29, 2023;
    (e)    **ALLY FINANCIAL** Dated Dec 29, 2023;
    (f)    **AUTONATION FINANCE** Dated Dec 29, 2023;
    (g)    **AMERICREDIT FINANCIAL SERVICES** Dated Dec 29, 2023;
    (h)    **TOYOTA MOTOR CREDIT** Dated Dec 29, 2023;
    (i)    **CAP ONE VIA DEALER** Dated Dec 29, 2023;
    (j)    **LEXUS OF PALM BEACH #2945** Dated Dec 28, 2023;
    (k)    **LEXUS OF PALM BEACH #2945** Dated Jun 09, 2023.

105.    Plaintiff did not apply for credit with any of the aforementioned entities and did not have a relationship with any of the aforementioned entities. Defendant did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

106.    Upon information and belief, all three of the above-referenced inquiries were initiated by credit applications submitted by the distinctive consumer.

107.    As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Defendant on the above-referenced dates, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's credit report from Defendant, Upon information and belief, Defendant disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

108.    Thereafter, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the other consumer and likely Defendant continued to report the other consumer's information to Plaintiff's credit file.

109.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

110.    Upon information and belief, because Defendant continues to mix Plaintiff's credit file with that of the distinctive consumer, Defendant continues to sell Plaintiff's credit reports in response to applications and inquiries pertaining to the unrelated consumer.

111.    As a result of the "mixed file," Defendant made it practically impossible for Plaintiff to obtain credit throughout the years of the mix.

112.    Specifically, in or around July 2023, Plaintiff came in need of access to funds to cover airline tickets. As such in or around July 2023, Plaintiff submitted a credit/loan application with Uplift, Loan Program, a partner of CBW Bank. Upon information and belief, loans originated

on the Uplift platform were underwritten and made by CBW Bank. Plaintiff was promptly denied this credit/loan application on July 4, 2023.

113.    Upon information and belief, due to the mixture of Plaintiff's credit file with that of the distinctive consumer thereby associating Plaintiff's consumer file with that of the distinctive consumer, Defendant represented to Uplift and/or CBW Bank, that it had no credit files belonging to Plaintiff which can be furnished to Uplift and/or CBW Bank.

114.    The next year of 2024, Plaintiff again struggled with meeting personal financial responsibilities and submitted a loan application with Upgrade, a partner of Celtic Bank on or about November 21, 2024, to cover airline tickets. Upon information and belief, loans originated on the Upgrade platform are issued by Celtic Bank.

115.    On or about the same day of November 21, 2024, an adverse action notice from Upgrade on behalf of Celtic Bank, was sent out with a denial reason indicating that her credit score cannot be obtained.

116.    Upon information and belief, due to the mixture of Plaintiff's credit file with that of the distinctive consumer thereby associating Plaintiff's consumer file with that of the distinctive consumer, Defendant represented to Upgrade and/or Celtic Bank, that it had no credit score belonging to Plaintiff which can be furnish to Upgrade and/or Celtic Bank.

117.    On or about November 27, 2024, Plaintiff submitted two checking account applications to PenFed Credit Union. Both applications were denied on the same day, citing reasons that included the inability to obtain a credit file or a lack of credit activity being reflected.

118.    Upon information and belief, as a direct result of Defendant's mixing of Plaintiff's credit file with that of another consumer, Defendant erroneously conveyed to PenFed Credit Union that no credit file belonging to Plaintiff could be located or provided. This misrepresentation

effectively associated Plaintiff's identity with that of the other consumer, leading to the denial of her applications.

119.     Consequently, and upon information and belief, Defendant's actions deprived Plaintiff of the financial benefits and opportunities that accompany banking with a federal credit union, such as (upon information and belief) access to competitive interest rates, specialized financial products, and enhanced financial services. This denial further exacerbated Plaintiff's financial hardship and limited her ability to pursue opportunities to secure her financial stability and growth.

120.     After sustaining her last credit denial, fearing for continued damage to her credit by the presence of hard inquiries for which no credit extension was granted, Plaintiff ceased applying for credit thereby sustaining additional damages as her financial needs only increased leaving her to suffer by not submitting credit applications that could have been granted and thereby afford her the credit extensions she needed.  Following yet another denial, Plaintiff, deeply concerned about the compounding harm to her credit profile caused by the presence of unauthorized hard inquiries, made the difficult decision to cease applying for credit altogether.

121.     This decision, while intended to mitigate further damage to her creditworthiness, resulted in significant financial repercussions. Plaintiff's growing financial needs went unmet as she refrained from submitting credit applications that may have otherwise been approved and provided her with the necessary financial resources. The inability to access credit constrained her ability to manage essential expenses, invest in opportunities, and maintain financial stability, exacerbating her financial hardship and emotional distress. This limitation, born of fear and necessity, underscored the severe impact of Defendant's inaccurate credit reporting on Plaintiff's financial well-being and quality of life.

*Edlyne Thervil v. Equifax*
*Information Services, LLC*
Complaint

122.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

123.    At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

124.    As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes.  Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

125.    Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

126.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial

information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; financial loss; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Equifax)

127.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

128.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

129.    On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

130.    Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

*Edlyne Thervil v. Equifax*
*Information Services, LLC*
Complaint

131.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

132.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; financial loss; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

133.    Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

134.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Equifax)**

135.    Plaintiff re-alleges and incorporates by reference the allegations set forth in

*Edlyne Thervil v. Equifax*
*Information Services, LLC*
Complaint

preceding paragraphs as if fully stated herein.

136.    The FCRA mandates that Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

137.    The FCRA provides that if Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

138.    Plaintiff initiated a dispute with Defendant, by submitting a formal complaint with the CFPB, disputed the inaccurate information reported in her credit file and requested that Defendant correct and/or delete the inaccurate, misleading, and highly damaging information belonging to a distinct consumer.

139.    Defendant failed to respond to Plaintiff's dispute and conducted *no* investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

140.    Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

141.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; financial loss; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

142.    Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

143.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681b(a)**
**Furnishing a Credit Report Without a Permissible Purpose**
**(Third Claim for Relief Against Defendant Equifax)**

144.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

145.    This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

*Edlyne Thervil v. Equifax*
*Information Services, LLC*
Complaint

146.    Plaintiff is a "consumer" as defined by the FCRA.

147.    Defendant is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

148.    The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

149.    On multiple occasions, Defendant furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

150.    Defendant violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

151.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; financial loss; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit

denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

152.   Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.   Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

153.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendant negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: January 22, 2025

*/s/David Pinkhasov*
David Pinkhasov, FL # 1040933
CONSUMER ATTORNEYS
68-29 Main Street
Flushing, NY 11367
T: (718) 701-4605
F: (718) 715-1750
E: dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff,*
*Edlyne Thervil*

29/29

*Edlyne Thervil v. Equifax*
*Information Services, LLC*
Complaint